**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| CHRISTOPHER STRAUB and JAMES AND CHRISTIE RANUM, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY,<br><br>    Defendant. | Civil Action No. _____<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiffs Christopher Straub, James Ranum, and Christie Ranum (collectively, "Plaintiffs"), acting on behalf of themselves and all others similarly situated ("Class Members"), bring this action for damages and equitable relief against Defendant Ford Motor Company ("Defendant" or "Ford").

## NATURE OF THE CASE

1.    Ford designed, manufactured, distributed, marketed, sold, and leased its Model Year 2015-2018 Ford Edge with 2-liter I-4 turbocharged Ecoboost automatic-transmission engines in four different trims: Special Edition, Special Edition Limited, Titanium, and Sport ("Class Vehicles"). Plaintiffs and Class Members are consumers who purchased the Class Vehicles.

2.    Situated between each Class Vehicle's engine and gearbox is a device known as a "flexplate."[1]

3.    The flexplate plays an "essential" role in the vehicle's engine.[2] The underlying principle behind a flexplate is "to store the energy that is generated by the engine until it is needed and to deliver it in a smooth and even way via [the gearbox], . . . in order to propel the vehicle

---

[1] https://www.carbibles.com/what-is-a-flexplate/ (last visited December 17, 2020).
[2] *Id.*

along."[3] While the engine generates the power necessary to propel the vehicle, the flexplate plays the essential role of "captur[ing] the energy that is created by the engine and stor[ing] it in its large mass by spinning at a speed that, although it is not required all the time, is smooth and even."[4] This energy is then transferred to the vehicle's torque converter, which, in turn, transfers the energy to the gearbox, thereby allowing the vehicle to move.[5]

4.    The center of the flexplate is bolted to the crankshaft of the engine; and a torque converter is bolted to the flexplate with a bolt pattern that is larger than the crankshaft bolt pattern. The torque converter is then connected to the engine's automatic transmission.

5.    Unfortunately, each and every Class Vehicle is manufactured with a serious safety defect in the flexplate. While operating under normal driving conditions and without warning, the flexplate can crack and/or shatter, causing the Class Vehicle to lose forward propulsion (the "Flexplate Defect").

6.    The Flexplate Defect exists in all 2015-2018 Model Year Ford Edge vehicles. In particular, the Flexplate Defect manifests when the area between the circular bolt patterns for the crankshaft and torque converters fails by cracking and/or shattering. When the Flexplate Defect manifests, the flexplate separates completely around the bolts, leaving a center portion of the ring gear attached to the crankshaft and the outer portion attached to the torque converter. The Flexplate Defect can manifest in the original flexplate that is incorporated into each Class Vehicle at the time of manufacture, as well as in any replacement part used in an effort to remediate the issue.

---

[3] *Id.*
[4] *Id.*
[5] *Id.*

7.      The root cause of the Flexplate Defect is structural weakness inherent in the design, the manufacture, and/or materials of the flexplate itself, a determination of which must be based upon the facts and details only available to Plaintiffs through discovery. This weakness  of the flexplate is exacerbated by stress risers introduced during the stamping process used to manufacture the flexplate. Vibrations arising during normal operation of the Class Vehicle's engine create the mechanical forces that initially cause a crack in the flexplate, which ultimately propagates its way around the component until the failure is complete and a separation occurs.

8.      Manifestation of the Flexplate Defect causes the Class Vehicle to stall completely and to come to a sudden, unexpected stop, which can result in a collision with other motor vehicles if the manifestation occurs while the Class Vehicle is in motion. Even if an immediate collision does not occur, a dangerous hazard remains in the event that the Class Vehicle stops and cannot be moved from a road, bridge, tunnel, or railroad track.

9.      Due to the nature of the Flexplate Defect, manifestation will almost exclusively occur while a Class Vehicle is in motion.

10.     Prior to purchasing their Class Vehicles, Plaintiffs and Class Members did not know of, and despite exercising reasonable care and diligence, could not reasonably be expected to have learned about, the existence of the Flexplate Defect. Ford uniformly misrepresented to Plaintiffs and Class Members that the Class Vehicles were safe for their intended purpose and free of defects. Ford neither disclosed the Flexplate Defect, nor instructed its authorized dealers to disclose the Flexplate Defect to Class Vehicle owners and prospective purchasers. At the time Plaintiffs and Class Members purchased their Class Vehicles, they did not contemplate that they would have to incur costly expenses to address the existence of the undisclosed Flexplate Defect.

11.     Ford knew that the Class Vehicles uniformly suffer from the Flexplate Defect, rendering them unfit for their intended purpose of providing consumers with safe and reliable transportation.

12.     Ford actively and affirmatively misrepresented to Plaintiffs and Class Members that the Class Vehicles were fit for their intended purpose of providing consumers with safe and reliable transportation despite its knowledge of the Flexplate Defect.

13.     Once it could no longer deny its knowledge of the existence of the Flexplate Defect, Ford actively concealed it from Plaintiffs and Class Members. Ford's concealment of the existence of the Flexplate Defect caused Plaintiffs and Class Members to experience its manifestation both within and outside Ford's written warranty period. Ford had an affirmative duty to disclose the Flexplate Defect, a safety defect that is present (albeit unmanifested) in all of its Class Vehicles from the point of manufacture.

14.     Plaintiffs and Class Members exercised reasonable care and diligence in an effort to identify the problem that each uniformly experienced in connection with the flexplate within their Class Vehicles, but were unable to independently identify the Flexplate Defect or determine that Ford fraudulently concealed the existence of the Defect.

15.     Had Plaintiffs and Class Members known at the time of purchase or lease about the Flexplate Defect and its associated costs and safety hazards, they either would not have purchased the Class Vehicles or would have paid less for them.

16.     On information and belief, other parts, components and assemblies of the Class Vehicle's engine and drivetrain are detrimentally affected by the Flexplate Defect. For example, a Class Vehicle's starter motor may be damaged or destroyed as a result of the manifestation of the Flexplate Defect.

4

17.    As a result of the Flexplate Defect, the resale value of Class Vehicles is greatly diminished.

18.    Every Class Vehicle was sold or leased pursuant to express and implied warranties, including a Powertrain Limited Warranty, that covers the cost of all parts and labor necessary to replace or repair powertrain components, including the flexplate, that are defective in workmanship and materials within five years or 60,000 miles, whichever occurs first. The Powertrain Limited Warranty begins to run on the date that the Class Vehicle is first put into service. Should discovery show that the Flexplate Defect is the result of a defect in workmanship or materials, it should be covered by the Powertrain Limited Warranty.

19.    In addition, every Class Vehicle was sold or leased pursuant to a three-year or 36,000 New Vehicle Limited Warranty that covers the cost of all parts and labor necessary to replace most components, including powertrain components, that begins to run the date the Class Vehicle is first put into service.

20.    Despite its knowledge of the existence and consequences of the Flexplate Defect, Ford failed to: (a) recall the Class Vehicles; (b) offer a suitable repair or replacement free of charge; (c) replace or repair defective flexplates and any other internal and external parts damaged by the Flexplate Defect; or (d) offer to reimburse Class Vehicle owners and leaseholders who incurred expenses caused by the Flexplate Defect.

21.    As a result of their reliance on Ford's acts and omissions, Plaintiffs and Class Members suffered ascertainable losses of money, property, and/or value of their Class Vehicles.

## **PARTIES**

**Plaintiffs**

5

22.     Plaintiff Christopher Straub is a citizen of the State of North Carolina and lives in Raleigh, North Carolina. On August 10, 2015, he leased a new 2015 Ford Edge from Crossroads Ford located in Fuquay Varina, North Carolina.

23.     Plaintiffs James and Christie Ranum (collectively, "the Ranums") are citizens of the State of Florida and live in Saint Cloud, Florida. On January 13, 2017, the Ranums purchased a certified, pre-owned 2015 Ford Edge Titanium Eco-Boost from Off Lease Orlando, Florida.

**Defendant Ford Motor Company**

24.     Ford is a corporation doing business in all fifty states and the District of Columbia and is organized under the laws of the State of Delaware, with its principal place of business in Dearborn, Michigan.

25.     At all times relevant to this action, Ford manufactured, sold, and warranted Class Vehicles throughout the United States.

26.     Ford and/or its agents, divisions, or subsidiaries designed, manufactured, and installed the defective flexplates within the Class Vehicles. Ford also developed and disseminated the owner's manuals, supplements, and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles.

27.     Ford and/or its authorized agents, dealerships, and service departments made representations and omissions regarding the qualities of the Class Vehicles, about the existence, nature and consequences of the Flexplate Defect, and the warranties applicable to Class Vehicles.

## JURISDICTION AND VENUE

28.     This Court has jurisdiction over the state and federal law claims at issue in this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). There are at least 100 Members in the proposed Class, the aggregated claims of the individual Class Members exceed the sum or

value of $5,000,000.00 exclusive of interest and costs, and Members of the proposed Class are citizens of states different from Ford. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

29.     This Court may exercise jurisdiction over Ford because, through its business of distributing, selling, and leasing the Class Vehicles in this District, it established sufficient contacts in this District such that personal jurisdiction is appropriate.

30.     Venue is proper in this District under 28 U.S.C. § 1391(a) because a substantial part of the events, omissions, and/or misrepresentations giving rise to Plaintiffs' claims occurred in this District. Ford is headquartered in Dearborn, Michigan, which is within this District. It sells and distributes its vehicles, including the Class Vehicles, throughout the United States and within this District.

## PLAINTIFFS' FACTS

### Plaintiff Christopher Straub

31.     Plaintiff Christopher Straub is a citizen of the State of North Carolina and lives in Raleigh, North Carolina. On August 10, 2015, Mr. Straub leased a new 2015 Ford Edge from Crossroads Ford located in Fuquay Varina, North Carolina, VIN #2FMTK4K99FBB58723.

32.     Prior to his lease of his Class Vehicle, Mr. Straub read advertising about and carefully researched the Ford Edge, and shopped around for the particular vehicle he would lease. He chose to lease his Class Vehicle based on Ford's representations and his reasonable understanding and expectation that it would be reliable and provide safe transportation.

33.     Mr. Straub uses his Class Vehicle for personal, family, or household purposes.

34.     Mr. Straub's Class Vehicle was designed, manufactured, sold, distributed, advertised, marketed, and warranted by Ford.

7

35.     Mr. Straub's Class Vehicle came with a Basic New Limited Warranty and Powertrain Limited Warranty, which accompanies all Ford vehicles.

36.     In October 2018, at the conclusion of his lease period, Mr. Straub purchased his Class Vehicle.

37.     None of the advertising or information that Mr. Straub reviewed regarding the Class Vehicle prior to his purchase mentioned the Flexplate Defect, nor did the authorized Ford dealer's sales representative disclose the Defect to him while making other affirmative representations to him regarding the Class Vehicle at the time of his lease.

38.     Mr. Straub was not aware of, and never informed about, the Flexplate Defect prior to either leasing or subsequently purchasing his Class Vehicle.

39.     On February 14, 2020, Mr. Straub noticed a rattling noise coming from the engine of his Class Vehicle.  The noise was most prominent during start-up and while idling, but also occurred during normal driving conditions.

40.     Despite some basic investigation, Mr. Straub could not identify the cause of the rattling noise and took his Class Vehicle to Crossroads Ford for inspection on February 20, 2020. At that time, he told the service technician about the rattling noise. The technician failed to identify any issue, failed to disclose the Flexplate Defect, and no service was performed.

41.     Five days later, on February 25, 2020, with approximately 79,000 miles on his Class Vehicle, Mr. Straub was driving on the highway in a normal and expected manner when it unexpectedly lost all propulsive power. Mr. Straub was able to coast to the shoulder of the highway with the engine still running. After shutting off the engine, it would not re-start and Mr. Straub had his Class Vehicle towed to Crossroads Ford for further inspection.

42.    The Crossroads Ford technicians determined that the flexplate in Mr. Straub's Class

Vehicle had shattered. It was also determined that this failure caused damage to the Bendix drive,

crankshaft seal, and the starter, which all had to be replaced. Mr. Straub was charged $2,040.00 for

the repairs, in addition to approximately $150.00 for towing, and $200.00 for a rental car. (See the

itemized repair records attached as **Exhibit A**)

43.    Mr. Straub communicated this information to Ford in a letter and was informed that

the failure was outside the coverage of his Powertrain Warranty, and that it would not cover his out-

of-pocket expenses. (March 16, 2020 Letter to Ford Motor Company and April 23, 2020 Response,

attached hereto as **Exhibits B and C**).

44.    Approximately seven months later, on September 1, 2020, now with approximately

85,000 miles on his Ford Edge, Mr. Straub again heard the rattling noise. Given his prior experience

with this same noise, Mr. Straub brought his Class Vehicle back to Crossroads Ford, where it was

diagnosed for a second time as having a cracked flexplate.

45.    On this occasion, Mr. Straub's Class Vehicle remained at the Crossroads Ford for

five weeks, until October 8, 2020. The flexplate was again replaced, despite having been installed

only about 6,000 miles before this failure.

46.    Mr. Straub was not charged for the second replacement of the flexplate, but was

without the use of his Class Vehicle for an extended period of time.

47.    On January 19, 2021, Mr. Straub's flexplate cracked again, the 3rd time in less than a

year, during normal use. The repair was covered under warranty and his Class Vehicle was kept by

Crossroads Ford for six weeks in order to repair the Class Vehicle.

48.    Mr. Straub either would not have purchased his Class Vehicle, or would have paid

less for it, had he been informed about the existence and potential consequences of the Flexplate

Defect. He did not receive the benefit of his bargain. Mr. Straub may choose to purchase another Ford vehicle in the future if Ford is ordered to truthfully disclose the Flexplate Defect. Should the Court issue such an order, Mr. Straub would consider purchasing another Ford vehicle in the future.

**Plaintiffs James and Christie Ranum**

49.     Plaintiffs James and Christie Ranum (collectively, "the Ranums") are citizens of the State of Florida and live in Saint Cloud, Florida.  On January 13, 2017, the Ranums purchased a certified, pre-owned 2015 Ford Edge Titanium Eco-Boost from Off Lease Orlando, VIN #22FMTK4K98FBB31058. The Ranums paid $22,863.00 for their Class Vehicle.

50.     Prior to purchasing their Class Vehicle, the Ranums read advertising about and carefully researched the Ford Edge Titanium and shopped around for the particular vehicle they would purchase. They chose to purchase their Class Vehicle based on Ford's representations and their reasonable understanding and expectation that it would be reliable and provide safe transportation.

51.     The Ranums use their Class Vehicle for personal, family, or household purposes.

52.     Their Class Vehicle was designed, manufactured, sold, distributed, advertised, marketed, and warranted by Ford.

53.     The Ranums' Class Vehicle came with a Basic New Limited Warranty and Powertrain Limited Warranty, which accompanies all Ford vehicles. Their Class Vehicle was within the time/mileage limitations for these warranties at the time of their purchase.

54.     None of the advertising or information regarding the Class Vehicle that the Ranums reviewed prior to their purchase mentioned the Flexplate Defect, nor were they informed of the Defect by the authorized Ford retailer's sales representative at the time of purchase.

55.     The Ranums were not aware of, and never informed about, the Flexplate Defect prior to purchasing their Class Vehicle.

56.     On November 21, 2020, the Ranums were driving their Class Vehicle in a normal and expected manner when they heard a rattling coming from the engine. Concerned, they decided they would take it to Kissleback Ford, in Saint Cloud, Florida, for an inspection.

57.     On November 30, 2020, technicians at Kissleback Ford told the Ranums that the flexplate and the torque converter within their Class Vehicle would need to be replaced, and that this repair would not be covered under the Basic New Limited Warranty and Powertrain Limited Warranty. During this inspection, the technicians failed to disclose the Flexplate Defect to the Ranums.

58.     The Ranums were charged $2,448.41 for a replacement of the flexplate and torque converter within their Ford Edge Titanium.

59.     The Ranums would not have purchased their Ford Edge Titanium or would have paid less for it had they been aware of the Flexplate Defect, and had they known that the system would not warn them if or when their Ford Titanium's flexplate was at risk. They did not receive the benefit of their bargain.

## FACTUAL ALLEGATIONS

### Introduction of the 2015 Ford Edge

60.     For years, Ford designed, manufactured, distributed, sold, and leased thousands of Class Vehicles directly or indirectly to Class Members, through its authorized dealers and other retail outlets throughout the United States.

61.     The 2015 Ford Edge was a clean sheet redesign for the second generation of the model. The first generation was produced for model years 2007–2014. In addition to being a totally

new design, the 2015 Ford Edge was the first Ford vehicle to be available with its new 2.0 L I-4 turbocharged Ecoboost engine.

62.    While Ford previously produced a 2.0L turbocharged engine, this new engine was a complete redesign. The engine was paired with a recently-debuted six-speed transmission. [6]

---

**Ford's Twin-Scroll 2.0-Liter EcoBoost Engine Debuting on 2015 Edge Offers More Capability, Better Performance Feel**

- New twin-scroll 2.0-liter EcoBoost® four-cylinder to debut in North America in all-new 2015 Ford Edge, offering more capability, better engine performance and improved turbo response
- Ford's innovative new four-cylinder engine features an advanced twin-scroll turbo system and higher compression ratio
- Ford's newest EcoBoost will be the standard engine in the all-new 2015 Ford Edge, which goes on sale in North America early next year; the starting price of the all-new Edge is unchanged from the 2014 model

**DEARBORN, Mich., Dec. 22, 2014** – The all-new 2015 Ford Edge, due in showrooms in early 2015, will be the first Ford vehicle in North America powered by the company's new twin-scroll 2.0-liter EcoBoost® engine. The 2015 model is the first Edge to come standard with EcoBoost power.

---

With final ratings approved, the front-wheel-drive Edge Sport returns EPA-estimated test cycle fuel economy ratings of 18 mpg city, 27 mpg highway and 21 mpg combined. EPA-estimated ratings for the all-wheel-drive model are 17 mpg city, 24 mpg highway and 20 mpg combined. Actual mileage will vary. Even with improved performance, fuel economy estimates are either equal to or better than the 2014 model Edge Sport.[7]

63.    "The 2015 Edge Sport is exactly what it says it is – a utility vehicle that not only looks beautiful, but is a spirited performer," said Cristina Aquino, Ford Edge Consumer Marketing manager. "Ford customer research showed there was a strong desire for more in terms of power and content, and with the redesign of Ford Edge, we wanted to give customers a true sport version, which meant bringing the 2.7-liter EcoBoost V6 along for the ride."[8]

**The Mechanics of the Flexplate**

---

[6] https://media.ford.com/content/fordmedia/fna/us/en/news/2014/12/22/2015-ford-edge-ecoboost.h (last visited December 18, 2020).

[7] https://media.ford.com/content/fordmedia/fna/us/en/news/2015/02/06/performance-and-power--2015-ford-edge-sport-certified-as-highest.html (last visited March 14, 2021).

[8] *Id.*

64.     The flexplate plays an "essential" role in the operation of the vehicle's engine, and, without it, the engine would be unable to propel the vehicle forward.[9] The basic principle behind the flexplate is to store the energy that is generated by the engine until it is needed and to deliver it in a smooth and even way via the vehicle transmission system (in particular, the gearbox) in order to propel the vehicle along.[10]

65.     Internal combustion engines are very powerful, but the power that an engine generates is not completely smooth. This is because the firing process comprises of several different actions that, despite happening very quickly, do not happen simultaneously. The power generated by the engine, therefore, is not smooth, but needs to be in order to prevent the ride of the vehicle from being rough and uneven. The flexplate effectively captures the energy created by the engine and stores it in its large mass by spinning at a speed that, although it is not required all the time, is smooth and even.[11]

66.     The energy held in the flexplate is transferred to the gearbox and transmission by means of the torque converter. The flexplate is mounted to the crankshaft of the engine in order to transfer the output (energy) from the engine to the torque converter. The engine is configured such that the torque converter is located between the flexplate and the gearbox.[12]

**The Effect of Stress on Engine Components**

67.     Any part in the engine must be able to withstand the stresses put against it. When it does not withstand the stress, it fails. This failure does not usually occur all at once, but usually occurs gradually over time until the part can no longer support the load and ultimately fails. Every

---

[9] https://www.carbibles.com/what-is-a-flexplate/ (last visited March 14, 2021).
[10] *Id.*
[11] *Id.*
[12] *Id.*

load bearing member has to provide resistance to a load. When this load is applied, there is an elastic deformation which occurs in the material. There is no such thing as a perfectly stiff or absolutely rigid structure. In order for the object to support a load, it has to be able to deform in some way or another. Think of a wooden deck you have attached to the rear of your house. As you step on a board, it supports the load, but it does bend somewhat in the process.[13]

68.     Stress risers always occur on the outside of an object, where maximum stress is located. And where maximum stress occurs is where cracks begin to form. There are two ways to stop or impede the progress of a crack formed at a stress riser. The first is by the reduction (or elimination) of the load, which usually happens as the load cycles. The second is in the structure of the metal itself. As the crystalline lattice is disturbed at the leading edge of the crack, progress is blocked. However, once a crack has formed and is stopped by either the cycling of the load or the lattice crystalline structure, the cross section of the part has been reduced. Even if the next load cycle is the same as the previous load cycle, since the cross section is reduced, the stress is increased at this point. The crack becomes a stress concentrator. As more load cycles occur, the crack will be elongated due to the stress concentration and because the crack itself will be jagged, which also helps promulgate the stress. As the load stress cycles and is released, it progresses as "crack, pause, crack, pause, etc.," until the part completely fails.

69.     At high speeds, the flexplate—like most engine parts—endures a considerable amount of strain and stress. When it develops a crack, it cannot function as intended. When this occurs, the Class Vehicle loses power, and the driver is unable to accelerate. In other instances, once

---

[13] https://mechanics.stackexchange.com/questions/18183/what-is-a-stress-riser (last visited March 14, 2021).

turned off, the Class Vehicle will not turn back on. More critically, the loss of speed and propulsion while driving in traffic during normal conditions is called "stalling" and is an extremely dangerous event that leaves a driver powerless while operating the Class Vehicle. This type of failure can result in injury and potentially death.[14]

## Ford's Knowledge of the Flexplate Defect

70.     On July 2, 2018, in SSM 47398, Ford acknowledged, for the first time, the Flexplate Defect manifesting within the Class Vehicles. This communication stated:

> Some 2015-2018 Edge vehicles equipped with a 2.0L EcoBoost and 6F35 transmission may exhibit a rattle noise from the transmission bellhousing area while running. This may be the result of a cracked engine flexplate. When replacing the flexplate, lubricate the torque converter pilot hub with Multi-Purpose Grease XL-5-A (ESB-M1C93-B) before reassembling. Make sure the transmission locator dowel pins are correctly installed. If the dowel pins were pulled out of the engine block, new dowel pins will need to be installed in the engine block. Failure to do so could result in a repeat repair. Refer to Workshop Manual (WSM), Section 307-01A. Engineering is investigating, monitor OASIS for updates. To assist with the investigation, use the Report a Vehicle Concern link at the bottom of the OASIS report and fill out the form.[15]

71.     On August 6, 2019, in TSB 19-2236, Ford again described a rattling noise within Class Vehicles that indicated manifestation of the Flexplate Defect. Ford did not recall a single Class Vehicle. In TSB 19-2236, Ford states:

> Some 2015-2018 Edge vehicles equipped with a 2.0L EcoBoost engine may exhibit a rattle. This may be more noticeable at idle. This may be due to a flexplate crack around the crankshaft. To correct the condition, follow the Service Procedure steps to replace the flexplate, transmission fluid pump, and torque converter.
>
> **Action:** Follow the Service Procedure steps to correct the condition on vehicles that meet all of the following criteria:
> • 2015-2018 Edge
> • 2.0L EcoBoost engine

---

[14]  https://itstillruns.com/cracked-flexplate-symptoms-7459926.html (last visited December 21, 2020).
[15]  https://www.carcomplaints.com/Ford/Edge/2016/tsbs/tsb-ssm-47398.shtml (last visited December 21, 2020).

• Rattle noise from the bellhousing area.[16]

72.     Despite issuing this TSB, Ford did not recall any Class Vehicles or extend any kind of warranty coverage to Plaintiffs and Class Members.

73.     Moreover, Ford has refused to acknowledge that the Flexplate Defect affects additional Class Vehicles, beyond just Edge models.

74.     Notably, the fix for the "rattling noise from the bellhousing area" referenced in TSB 19-2236 is a replacement of the flexplate, torque converter, flexplate bolts, transmission front pump, and sometimes the engine short block.[17]

**Labor Times**

| Description | Operation No. | Time |
|---|---|---|
| 2015-2018 Edge FWD 2.0L EcoBoost: Diagnose Noise, Remove Transmission And Inspect Flexplate And Crankshaft Mounting Face For Damage (Pass), Replace The Torque Converter, Flexplate, Flexplate Bolts And Transmission Front Pump (Can Be Claimed With Operation E Or F) (Do Not Use With Any Labor Operations Outside Of This Article) | 192236A | 9.3 Hrs. |
| 2015-2018 Edge FWD 2.0L EcoBoost: Diagnose Noise, Remove Transmission And Inspect Flexplate And Crankshaft Mounting Face For Damage (Fail), Replace The Torque Converter, Flexplate, Flexplate Bolts, Transmission Front Pump And Engine Short Block (Can Be Claimed With Operation E Or F) (Do Not Use With Any Labor Operations Outside Of This Article) | 192236B | 18.5 Hrs. |
| 2015-2018 Edge AWD 2.0L EcoBoost: Diagnose Noise, Remove Transmission And Inspect Flexplate And Crankshaft Mounting Face For Damage (Pass), Replace The Torque Converter, Flexplate, Flexplate Bolts And Transmission Front Pump (Can Be Claimed With Operation E Or F) (Do Not Use With Any Labor Operations Outside Of This Article) | 192236C | 10.6 Hrs. |
| 2015-2018 Edge AWD 2.0L EcoBoost: Diagnose Noise, Remove Transmission And Inspect Flexplate And Crankshaft Mounting Face For Damage (Fail), Replace The Torque Converter, Flexplate, Flexplate Bolts, Transmission Front Pump And Engine Short Block (Can Be Claimed With Operation E Or F) (Do Not Use With Any Labor Operations Outside Of This Article) | 192236D | 19.7 Hrs. |
| Vehicles Without Lane Departure: Additional Time To Check And Correct Front Toe (Can be Claimed With Operation A-D Only) | 192236E | 0.6 Hrs. |
| Vehicles With Lane Departure: Additional Time To Check And Correct Front Toe (Can be Claimed With Operation A-D Only) | 192236F | 0.8 Hrs. |

---

[16] Technical Service Bulletin dated August 6, 2019, attached hereto as **Exhibit D**.
[17] Exhibit C, at page 3.

75.     Class Vehicle owners have reported hearing rattling during normal use of their Vehicles, but especially while in neutral and park. Unbeknownst to Plaintiffs and Class Members, the rattling noise described within TSB19-2236 was one manifestation of the Flexplate Defect.

76.     In August 2020, Ford updated 19-2236 to TSB 20-2212.[18]

77.     Each and every Class Vehicle suffers from one or more defects in materials, components, construction, and/or design, that constitute the Flexplate Defect, as described herein.

78.     Manifestation of the Flexplate Defect to the point of complete failure causes Class Vehicles to unexpectedly lose propulsion, creating an obvious safety risk, such that the Vehicles do not provide a means of safe, reliable transportation. Drivers and other occupants are left at risk of the Class Vehicle causing an accident or being stranded in hazardous traffic conditions, dangerous weather conditions, and/or remote locations.

79.     On information and belief, Ford learned of the Flexplate Defect prior to 2015 through sources not currently available to Class Members in the absence of discovery, including, but not limited to: (1) pre-release testing data; (2) early consumer complaints about the Flexplate Defect to Ford and its authorized dealers about the Class Vehicles; (3) consumer complaints about other earlier model Ford vehicles using a substantially similar flexplate design; (4) testing conducted in response to those complaints; (5) data from Ford's authorized dealers and service centers, including dealer

---

[18] See Technical Service Bulletin dated August 24, 2020, attached hereto **as Exhibit D**.

repair orders; and (6) warranty department data, including reimbursement requests and denials, and goodwill reimbursement requests and denials.

80.    At a certain stage of the Flexplate Defect, the parts of the flexplate function enough for the Class Vehicle to propel itself. In other words, the parts are held together such that the inner part can still engage and rotate the outer part even though they are no longer fully connected. This results in a rattling noise coming from the area of the flexplate. Within a short amount of time from the start of the rattling noise, however, the flexplate will fail completely and the Class Vehicle will cease to move forward or backward. There are virtually no indicators that a catastrophic manifestation of the Flexplate Defect is about to occur.

81.    As described above, Plaintiffs only heard a rattling sound in their Class Vehicles' engines. The first time that Mr. Straub heard the rattling, it in no way indicated that he was about to suffer a complete failure of the drivetrain while his Class Vehicle was being operated on the highway. He only knew to take his Class Vehicle to the dealership for the second failure because he had suffered the first manifestation. Similarly, prior to taking their Class Vehicle to the dealership only to be told that the flexplate and other components would have to be replaced, the Ranums heard a rattling sound which in no way indicated there was an imminent and potentially catastrophic failure of the flexplate.

82.    Despite knowledge that the Flexplate Defect and its consequences were unknown to Plaintiffs and Class Members, and would be undiscoverable to them until manifestation of the Defect, Ford took no proactive steps (such as a recall) to remedy the Flexplate Defect before the Class Vehicles were purchased or leased, or before damage was done to their engines. Ford knowingly left Plaintiffs and Class Members driving dangerously defective Class Vehicles with no idea whatsoever of the hazard to which they were exposed.

18

83.     Upon information and belief, thousands of purchasers and lessees of the Class Vehicles have already experienced manifestations of the Flexplate Defect. Complaints reported by consumers to the National Highway Traffic Safety Administration ("NHTSA"), as well as numerous complaints and experiences posted on various Internet sites, demonstrate the widespread and uniform manifestation of the Flexplate Defect.

84.     Ford, like other automobile manufacturers, monitors reports made to NHTSA, posts on Internet websites and fora, and consumer reports received by its authorized dealerships and service departments as part of its quality control measures. These complaints, some of which are reproduced below, are evidence that Ford either knew, should have known, and/or was reckless or indifferent in failing to recognize the Flexplate Defect and its potential danger. (Spelling and grammar mistakes remain as found in the original reports.)

- NHSTA Complaint on November 1, 2020 for a 2015 Ford Edge: WHILE DRIVING ACROSS OAK ISLAND 2 LANE BRIDGE AT APPROX 45 MPH, MY EDGE STARTED REVVING AT A HIGH RPM, ONE LOUD CLUNK & CAR WAS STILL RUNNING, BU\T LOST ALL TRANSMISSION. I TRIED TO SHIFT IN ANOTHER GEAR, BUT NO POWER TRANSFER. TRAFFIC WAS HEAVY & SHOULDER WAS SMALL. DRIFTED TO STOP IN SHOULDER & CALLED 911. POLICE CAME & PROTECTED MY VEHICLE WHICH WAS IN AN EXTREMELY BAD POSITION. I HAD NOWHERE TO GO IF I WANTED TO MOVE TO A SAFER POSITION. I HAD TO WAIT IN VEHICLE UNTIL POLICE CAME. IT WAS SUNDAY, TOW TRUCK OPERATOR WAS ON CALL. ALL TOTAL I WAS IN THAT LOCATION FOR MORE THAN AN HOUR. HAD CAR TOWED TO LOCAL MECHANIC WHO DIAGNOSED IT TO BE SHATTERED FLYWHEEL AT LEAST. PROBABLY MORE DAMAGE, BUT RECOMMENDED TO HAVE IT SERVICED AT A FORD DEALERSHIP DUE TO THEIR INTERNAL SERVICE BULLETINS NOTING THIS ISSUE. BULLETIN #19-2236 8/6/2019

- NHSTA Complaint on October 13, 2020 for a 2015 Ford Edge: THE FLEX PLATE/FLYWHEEL HAS NOW FAILED FOR THE 3RD TIME IN LESS THAN 2 YEARS. THIS IS CONFIRMED BY AN AUTHORIZED FORD DEALERSHIP AND STILL HAS NO RECALL ON THIS PART THAT IS CLEARLY A MANUFACTURER DEFECT. THE DAMAGED FLEX PLATE HAS CAUSED MY 2015 FORD EDGE TO HAVE A TERRIBLE RATTLING NOISE AND CAUSES CONCERN FOR SAFETY IF THIS PART WHERE TO BREAK APART WHILE DRIVING CAUSING THE WHEELS

OR MOTOR TO LOCK UP WHILE IN MOTION. ISSUE BEGAN WHILE CITY DRIVING

- NHSTA Complaint on June 4, 2020 for a 2015 Ford Edge:: THE FORD EDGE HAS A CRACKED FLEXPLATE AND EMITS A RATTLING NOISE AND FORD WILL NOT ADDRESS THE PROBLEM. A CRACKED FLEXPLATE SHOULD NOT HAPPEN, LET ALONE AT 50K. THE VEHICLE NOW SOUNDS LIKE A DIESEL AND PUTS THE DRIVER AND OTHERS AT RISK. SHOULD THE FLEXPLATE FAIL, THE RESULTING DAMAGES AND INJURIES COULD BE DEADLY. THIS HAPPENS ARE STARTUP AND WHEN SLOWING DOWN. *TR

  NHSTA Complaint on March 18, 2020 for a 2015 Ford Edge: I WAS DRIVING DURING MY NORMAL ROUTINE, FROM PICKING UP MY BABY AT DAYCARE TO GO HOME WHEN A RATTLE NOISE SUDDENLY STARTED. IT WAS NOT TOO LOUD IN THE BEGINNING, BUT AS I APPROACHED THE HOUSE, THE NOISE STARTED GETTING LOUDER AND LOUDER MOSTLY WHEN IDLING AT STOP SIGNS OR RED LIGHTS, FOR EXAMPLE. THE 2015 FORD EDGE AWD 2.0 L ECOBOOST IS 4.5 YEARS OLD AND HAS 66,000 MILES. THE DAY AFTER, I TOOK THE CAR TO A FORD DEALERSHIP AND WAS TOLD THAT THE FLEX PLATE WAS BROKEN AND SO IS PRETTY MUCH EVERYTHING THAT IS ATTACHED TO IT INCLUDING THE CRANKSHAFT, TORQUE CONVERTER, AND FLUID PUMP AND THAT I WOULD NEED TO REPLACE THE WHOLE ENGINE. FORD PROVIDED ME A CASE NUMBER, BUT NO FURTHER ASSISTANCE SINCE THE VEHICLE IS NO LONGER UNDER WARRANTY. THE CAR IS CURRENTLY AT THE AUTHORIZED DEALERSHIP. I WAS QUOTED $7,300 TO FIX THE VEHICLE. A PROBLEM WITH A FLEX PLATE CAN BE VERY DANGEROUS AS I'M UNDERSTANDING THAT THEY TRANSMIT THE POWER FROM YOUR ENGINE TO THE TRANSMISSION. I COULD HAVE LOST MY ABILITY TO CONTROL THE VEHICLE'S POWER. A BAD FLEX PLATE COULD POTENTIALLY CAUSE A LOSS OF POWER TO THE WHEELS AND RESULT IN AN ACCIDENT. IN ADDITION, THE FLEX PLATE BROKE THE CRANK SHAFT AND TORQUE CONVERTER, WHICH ALSO PREVENTS THE ENGINE TO FUNCTION PROPERLY. MY VEHICLE IS LESS THAN 5 YEARS OLD AND THIS HAS HAPPENED ALREADY WITH IT. I'M FORTUNATE TO HAVE NOT SUFFERED AN ACCIDENT BECAUSE OF THIS.

- NHSTA Complaint on January 6, 2020 for a 2015 Ford Edge: AFTER DRIVING THE CAR UNDER NORMAL CONDITIONS FOR THE FIRST 40K MILES IT STARTED TO MAKE RATTLING NOISES. TOOK IT TO THE DEALER AND IT HAD A BROKEN FLYWHEEL.

  18K MILES LATER IT HAS ANOTHER BROKEN FLYWHEEL

- NHSTA Complaint on February 1, 2020 for a 2015 Ford Edge:: TL* THE CONTACT OWNS A 2015 FORD EDGE. WHILE OPERATING THE VEHICLE, A RATTLING NOISE WAS HEARD FROM THE ENGINE COMPARTMENT. THE VEHICLE WAS

TAKEN TO AN INDEPENDENT MECHANIC WHO DIAGNOSED THAT THE FLEX PLATE WAS CRACKED AND NEEDED TO BE REPLACED. THE VEHICLE WAS REPAIRED, BUT THE FAILURE RECURRED APPROXIMATELY 40,000 MILES LATER. TALLASSEE FORD (1618 GILMER AVE, TALLASEE, AL) AND THE MANUFACTURER WERE NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS 105,328.

- <u>NHSTA Complaint on May 31, 2019 for a 2015 Ford Edge</u>:: WHILE DRIVING ON A MAJOR HEADWAY HEADED OUT OF TOWN, MY CAR STARTED TO MAKE EXCESSIVE RATTLES AND NOISES COMING FROM THE ENGINE AREA, WHEN I WOULD COME TO A STOP THE NOISE WAS MUCH LOUDER. I SMELT A SLIGHT BURNT SMELL, AND ALSO NOTICED THE GEARS JUMPING IN AND OUT. I IMMEDIATELY PARKED THE CAR, CALLED FOR HELP AND HAD THE CAR TOWED BACK. I TOOK IT TO TAMIAMI FORD, IN WHICH THEY TOLD ME THE FLEX PLATE IS CRACKED. AND I WOULD NEED A NEEDED A NEW FLEX PLATE, TORQUE, CRANKSHAFT. I HAD ABOUT 69,000 MILES ON THE CAR AT THIS POINT AND THEY SAID THE WARRANTY WAS EXPIRED AND WOULD NOT COVER THIS. THEY CONTACTED HIGHER PEOPLE AND YET STILL WOULD NOT COVER THE ISSUE. NEEDLESS TO SAY I HAD TO PAY FOR IT OUT OF POCKET. BUT AS I SEE MORE AND MORE PEOPLE ARE COMPLAINING OF THE SAME ISSUE ON FORUMS. I HAVE ATTACHED PICTURES OF MY CRACKED FLEXPLATE. I HAVE A TOW BILL AND REPAIR BILL BUT NOT ON HAND AT THE MOMENT.

- <u>NHSTA Complaint on April 11, 2020 for a 2015 Ford Edge</u>:: AT LESS THAN 40,000 MILES THE CAR STARTED MAKING A VERY LOAD RATTLING NOISE WHEN IDLING. THE NEXT DAY I TOOK IT TO THE FORD DEALERSHIP. 5 DAYS LATER THEY SAID IT WAS A CRACKED FLYWHEEL CAUSED BY AN ISSUE WITH THE TORQUE CONVERTER.

**Ford's Failure to Address the Flexplate Defect**

85.     Ford failed to conduct sufficient testing during the design phase of the Ecoboost engines and/or the second generation of the Ford Edge. As a result, Ford created the Flexplate Defect with the result that Plaintiffs and Class Members incurred significant expenses, such as having to pay for the replacement of failed flexplates and other engine and/or drivetrain components, towing charges, vehicle rentals, and other out-of-pocket expenses.

21

86.     Despite its knowledge of the Flexplate Defect, Ford's policy when owners or lessees of Class Vehicles suffer a manifestation of the Flexplate Defect is only to tell the consumer that the Class Vehicle will need repairs, which often cost hundreds or thousands of dollars and may not be covered under the Basic New Limited Warranty and Powertrain Limited Warranty if the issue is related to a design decision instead of a materials or workmanship problem. Discovery is necessary to determine the root cause of the defect.

87.     Ford never disclosed the Flexplate Defect to consumers. Information about the existence and potential consequences of the Flexplate Defect would be material to reasonable consumers in making their automobile purchasing decisions because it constitutes a grave safety hazard, regardless of the rate at which its manifestation occurs. For example, due to the nature of the Flexplate Defect, manifestation is likely to occur while the Class Vehicle is in motion and would lead to the vehicle likely stalling or becoming otherwise inoperable, which in turn poses a serious safety risk to the driver, passengers, and others on the roadway.

88.     Ford refuses to issue a recall or to provide repairs to the Class Vehicles at its own expense, and refuses to reimburse Class Vehicle owners and lessees who incur out-of-pocket costs as a result of manifestation of the Flexplate Defect.

89.     Plaintiffs and Class Members reasonably expected that Ford would not sell or lease Class Vehicles with the known Flexplate Defect. Further, Plaintiffs and Class Members reasonably expected that Ford would disclose the Flexplate Defect to customers before they purchased or leased Class Vehicles, or following their purchase or lease, in an effort to immediately remedy the safety Defect in the Class Vehicles. Plaintiffs and Class Members reasonably expected that Ford would not conceal the Flexplate Defect or deny its existence.

22

90.     Consequently, Plaintiffs and Class Members have not received the benefit for which they bargained when they purchased or leased the Class Vehicles. As a result of the Flexplate Defect, the value of the Class Vehicles has diminished, including without limitation, the resale value of the Class Vehicles.

## TOLLING OF THE STATUTE OF LIMITATIONS

**Discovery Rule Tolling**

91.     Plaintiffs and Class Members did not and could not have discovered through the exercise of reasonable diligence that their Class Vehicles suffered from the Flexplate Defect within the time period of any applicable statutes of limitation.

92.     Further, Plaintiffs and Class Members had no knowledge of the Flexplate Defect, as it concerns a Class Vehicle component that is not visible or reasonably accessible to consumers. Plaintiffs and Class Members have no reasonable means to learn of the existence of the Flexplate Defect until it manifests.

**Fraudulent Concealment Tolling**

93.     Throughout the time period relevant to this action, Ford actively concealed from and affirmatively failed to disclose to Plaintiffs and Class Members material information about the Flexplate Defect and its dangerous consequences.

94.     Ford kept Plaintiffs and Class Members ignorant of material information essential to the pursuit of their legal claims. As a result, neither Plaintiffs nor Class Members could have discovered the Flexplate Defect, even upon reasonable exercise of diligence.

95.     Throughout the time period relevant to this action, Ford knew that the Ecoboost engines it designed, manufactured, and installed in the Class Vehicles contained the Flexplate Defect.

96.     Despite its knowledge of the Flexplate Defect, Ford failed to disclose, concealed, and continues to conceal, this material information from Plaintiffs and Class Members, despite the fact that, at any point in time, it could have disclosed material information regarding the Flexplate Defect through individual correspondence, media release, a voluntary recall, or by other means.

97.     Plaintiffs and Class Members justifiably relied on Ford to disclose the Flexplate Defect in the Class Vehicles that they purchased or leased, because that Defect was hidden and not discoverable through reasonable efforts by Plaintiffs and Class Members.

98.     Thus, the expiration of all applicable statutes of limitation has or should have been suspended with respect to any claims that Plaintiffs and Class Members assert as a result of the Flexplate Defect, by virtue of the fraudulent concealment doctrine.

**Estoppel**

99.     Ford was under a continuous duty to disclose to Plaintiffs and Class Members the true character, quality, and nature of the Flexplate Defect.

100.    Ford knowingly concealed the true nature, quality, and character of the Flexplate Defect from Plaintiffs and Class Members.

101.    Based on the foregoing, Ford is and should be estopped from relying on the expiration of any statutes of limitations in its defense of this action.

## CLASS ACTION ALLEGATIONS

102.    Plaintiffs brings this lawsuit individually and as a class action on behalf of all others similarly situated, pursuant to Federal Rules of Civil Procedure ("Rule") 23(a), (b)(2), and/or (b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

103.    The Class and Sub-Classes are defined as:

**Nationwide Class**:

> *All current and former owners or lessees of a 2015, 2016, 2017, or 2018 model year Ford Edge model vehicles equipped with an Ecoboost 2 liter engine ("the Nationwide Class").*

**North Carolina Sub-Class**:

> *All current and former owners or lessees of a 2015, 2016, 2017, or 2018 model year Ford Edge model vehicles equipped with an Ecoboost 2 liter engine, who reside in the state of North Carolina, and who purchased or leased their vehicles in the State of North Carolina ("the North Carolina Sub-Class").*

**Florida Sub-Class**:

> *All current and former owners or lessees of a 2015, 2016, 2017, or 2018 model year Ford Edge model vehicles equipped with an Ecoboost 2 liter engine, who reside in the state of Florida, and who purchased or leased their vehicles in the State of Florida ("the Florida Sub-Class").*

104. Plaintiff Christopher Straub brings his claims on behalf of himself and Members of the National Class and the North Carolina Sub-Class.

105. Plaintiffs James and Christie Ranum bring their claims on behalf of themselves and Members of the National Class and the Florida Sub-Class.

106. Excluded from the Class and Sub-Classes are: (1) Ford, any entity or division in which Ford has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; and (3) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserve the right to amend the Class and Sub-Class definitions if discovery and further investigation reveal that the Class and Sub-Classes should be expanded or otherwise modified.

107. **Numerosity**: Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is expected to be in the hundreds of thousands, which is great enough such that joinder is impracticable. The disposition of the claims of

these Class Members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in Ford's possession, custody, or control, as well as from records kept by the Department of Motor Vehicles of various states.

108.   **Typicality**: The claims of the representative Plaintiffs are typical in that Plaintiffs, like all Class Members, purchased and/or leased a Class Vehicle designed, manufactured, and distributed by Ford that suffered from the Flexplate Defect. Plaintiffs, like all Class Members, have been damaged by Ford's misconduct. Furthermore, the factual bases of Ford's misconduct are common to all Class Members and represent a common thread of fraudulent, deliberate, and negligent acts and omissions resulting in injury to all Class Members.

109.   **Commonality**: There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any individual questions. These common legal and factual issues include the following:

a)   whether the Class Vehicles and their flexplates are defectively designed or manufactured such that they are not suitable for their intended use;

b)   whether the fact that the Class Vehicles suffer from the Flexplate Defect would be considered material to a reasonable consumer;

c)   whether, as a result of Ford's concealment or failure to disclose material facts, Plaintiffs and Class Members acted to their detriment by purchasing Class Vehicles manufactured by Ford;

d)   whether Ford was aware of the Flexplate Defect;

e)   whether Ford fraudulently concealed the Flexplate Defect;

f)   whether the Flexplate Defect constitutes an unreasonable safety risk;

g)   whether Ford breached express warranties with respect to the Class Vehicles;

h)   whether Ford has a duty to disclose the defective nature of the Class Vehicles and the Flexplate Defect to Plaintiffs and Class Members;

i)   whether Plaintiffs and Class Members are entitled to equitable relief, including but not limited to a preliminary and/or permanent injunction; and

j)   whether Ford violated the consumer protection statutes of North Carolina and Florida when it sold Class Vehicles to consumers in both states that suffered from the Flexplate Defect.

110.   **Adequate Representation**: Plaintiffs will fairly and adequately protect the interests of Class Members. Plaintiffs retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to prosecute this action vigorously.

111.   **Predominance and Superiority**: Plaintiffs and Class Members suffered, and will continue to suffer, harm and damages as a result of Ford's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of Class Members' individual claims, it is likely that few Class Members could afford to seek legal redress for Ford's misconduct. Absent a class action, Class Members will continue to incur damages, and Ford's misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation, in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

**FIRST CLAIM FOR RELIEF**
**Violation of the Magnuson-Moss Warranty Act**
**15 U.S.C. §§ 2301,** *et seq.*
**(On behalf of the proposed Nationwide Class)**

112.    Plaintiffs hereby incorporate by reference the allegations contained in the previous paragraphs of this Complaint, and incorporate the allegations in the Second and Third Claims for Relief.

113.    Plaintiffs brings this cause of action individually and on behalf of the Nationwide Class against Ford.

114.    Plaintiffs and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301(3).

115.    As pleaded above, this matter meets all jurisdictional requirements to be heard by this Court under CAFA, and therefore the Court also has jurisdiction over the Plaintiffs' MMWA claim.

116.    Ford is a "supplier" and "warrantor" within the meaning of 15 U.S.C. § 2301(4)-(5).

117.    The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

118.    Ford's express warranties are each a "written warranty" within the meaning of 15 U.S.C. § 2301(6).

119.    Specifically, the language of the New Vehicle Limited Warranty states "Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship."

120.    Ford provided a 3-year/36,000 mile New Vehicle Limited Warranty with the purchase or lease of the Class Vehicles.

121.    Ford also provided a 5-year/60,000 mile Powertrain Limited Warranty that covers the cost of all parts and labor necessary to repair powertrain components, including the engine, that are defective in workmanship and materials. Specifically, the Powertrain Limited Warranty states "Your vehicle's Powertrain components are covered for five years or 60,000 miles, whichever occurs first. The extended cover applies to the Engine: all internal lubricated parts . . . flywheel . . .."

122.    Ford breached these express warranties by:

a) Selling and leasing Class Vehicles that were defective in materials and workmanship at the point of sale, requiring repair or; and

b) Refusing and/or failing to honor its express warranties by repairing or replacing, free of charge, any damage caused by defective component parts.

123.    Ford's breach of its express warranties deprived Plaintiffs and Class Members of the benefits of their bargains.

124.    Ford has been afforded a reasonable opportunity to cure its breach of written warranties, including, instances when Plaintiffs and Class Members brought their vehicles in for diagnosis and repair subsequent to a manifestation of the Flexplate Defect.

125.    As a direct and proximate cause of Ford's breach of its express warranties, Plaintiffs and Class Members suffered damages at the point of sale stemming from their overpayment for Class Vehicles that suffered from the Flexplate Defect.

126.    Alternatively, should the Court or subsequent fact-finding indicate that Ford's written warranties do not apply to this Flexplate Defect, Plaintiffs' MMWA claim may be supported by its impliedly warranties. As further alleged in Claim Two, Ford provided Plaintiffs and Class Members with implied warranties that the Class Vehicles were merchantable and fit for the ordinary purposes

for which they were sold, namely providing a means of safe, reliable transportation. Ford's promises are "implied warranties" within the meaning of the MMWA, 15 USC § 2301(7).

127.    Plaintiffs and Class Members are entitled to recover actual damages, consequential damages, specific performance, diminution in value at the point of sale, costs, including statutory attorneys' fees, and/or other relief as appropriate.

**SECOND CLAIM FOR RELIEF**
**Common Law Breach of Implied Warranty**
**(On Behalf of the Proposed Nationwide Class)**

128.    Plaintiffs hereby incorporate by reference the allegations contained in the previous paragraphs of this Complaint.

129.    Ford was, at all relevant times, the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased.

130.    Ford provided Plaintiffs and Class Members with implied warranties that the Class Vehicles were merchantable and fit for the ordinary purposes for which they were sold, namely providing a means of safe, reliable transportation.

131.    The hazardous consequences of the existence of the Flexplate Defect, such as engine stalls, unexpected loss of power, and other problems, as discussed herein, pose a material safety risk, such that the Class Vehicles do not provide safe, reliable transportation, and, thereby, Ford breached the implied warranty of merchantability. These problems are exacerbated by the fact that Plaintiffs and Class Members are unaware of the existence of the Flexplate Defect until it manifests, which constitutes a further breach of the implied warranty.

132.    Ford impliedly warranted that: (1) Class Vehicles and their engines, which were manufactured, supplied, distributed, and/or sold by Ford, were safe and reliable for providing

transportation; and (2) Class Vehicles and their engines would be fit for their intended use while they were being operated.

133.    As a result of Ford's breaches of implied warranties, Plaintiffs and Class Members did not receive the benefit of their bargain and suffered damages at the point of sale, stemming from their overpayment for Class Vehicles with a latent safety defect.

### THIRD CLAIM FOR RELIEF
**Common Law Breach of Express Warranties**
**(On behalf of the Proposed Nationwide Class)**

134.    Plaintiffs hereby incorporate by reference the allegations contained in the previous paragraphs of this Complaint.

135.    In the course of selling the Class Vehicles, Ford expressly warranted in writing that the Vehicles were covered by certain warranties, including the New Vehicle Limited Warranty and Powertrain Limited Warranty.

136.    Ford breached its express warranties by failing to repair defects in materials and workmanship occasioned by the Flexplate Defect.

137.    Furthermore, Ford's New Vehicle Limited Warranty and Powertrain Limited Warranty fail in their essential purpose because their contractual remedies are insufficient to make Plaintiffs and Class Members whole, and because Ford fails and/or refuses to honor its warranty obligations within a reasonable time.

138.    Accordingly, recovery by Plaintiffs is not limited to remedies described in Ford's express warranties, and Plaintiffs seek all relief allowed by law.

139.    Moreover, at the time that Ford warranted and sold Class Vehicles, it knew that the Vehicles did not conform to its express warranties and were inherently and dangerously defective. Ford wrongfully and fraudulently misrepresented and/or concealed material facts regarding Class

31

Vehicles and the Flexplate Defect. Plaintiffs and Class Members were induced to purchase the Class Vehicles under false and/or fraudulent pretenses. Under these circumstances, enforcement of any warranty limitations precluding the recovery of incidental and/or consequential damages is unconscionable and unenforceable, as many of the damages incurred by Plaintiffs and Class Members cannot be remedied through "replacement or adjustments." Any limitation on Plaintiffs' remedies would be insufficient to make Plaintiffs and Class Members whole.

140.    Ford received notice of its breach through numerous complaints, including Plaintiffs' pre-suit correspondence, communications with Ford's authorized dealerships, and numerous other means regarding the Flexplate Defect before or within a reasonable amount of time.

141.    As a direct and proximate result of Ford's breach of its express warranties, Plaintiffs and Class Members did not receive the benefit of their bargain and suffered damages at the point the point of sale, stemming from their overpayment for their dangerously defective Class Vehicles.

<u>**FOURTH CLAIM FOR RELIEF**</u>
**Violation of Unfair Trade Practices and Consumer Protection Law**
**N.C. Gen. Stat. § 75-1.1**
**(On behalf of the North Carolina Sub-Class)**

142.    Plaintiff Straub hereby incorporates by reference the allegations contained in the previous paragraphs of this Complaint.

143.    Plaintiff Straub brings this claim on behalf of himself and the North Carolina Sub-Class.

144.    N.C. Gen. Stat § 75-1.1 makes unlawful, "[u]nfair methods of competition in our affecting commerce, and unfair or deceptive acts of practices in or affecting commerce."

145.    By selling the Class Vehicles throughout the State of North Carolina and making affirmative representations and/or material omissions regarding them, Ford affected commerce and trade within the State of North Carolina.

146.    Ford engaged in unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1 when, in selling and advertising the Class Vehicles, it failed to give Plaintiff Straub and the North Carolina Sub-Class adequate warnings and notice, despite the fact that it knew of the existence of the Flexplate Defect.

147.    Ford knew of the dangerous and defective nature of the Flexplate Defect, yet continued to sell and distribute the Class Vehicles.

148.    Ford's acts and omissions posed the tendency or capacity to mislead or create the likelihood of deception regarding a material fact.

149.    Ford knew, should have known, and/or was reckless or indifferent in failing to recognize that the flexplates in Class Vehicles were defective, would fail prematurely, were not suitable for use, and otherwise were not as warranted and represented.

150.    Ford's acts and omissions described herein repeatedly occurred in its trade or business, and were capable of deceiving a substantial portion of the consuming public.

151.    Ford's misrepresentations, concealment, omissions, and other deceptive conduct were likely to deceive, cause misunderstanding, and/or, in fact, caused Plaintiff Straub and the North Carolina Sub-Class to be deceived about the suitability of Class Vehicles for their ordinary and expected use, and about whether they would be backed by Ford's written warranties.

152.    Ford intended that Plaintiff Straub and the North Carolina Sub-Class would rely on its misrepresentations, concealment, warranties, deceptions, and/or omissions regarding the suitability, durability, and useful life of Class Vehicles.

33

153.     The facts concealed or not disclosed by Ford regarding the Flexplate Defect are, and would be, material in that Plaintiff Straub, the North Carolina Sub-Class, and any reasonable consumer would have considered the Flexplate Defect important in deciding whether to purchase Class Vehicles.

154.     Had Plaintiff Straub and the North Carolina Sub-Class known that the flexplates in the Class Vehicles were defective and would fail prematurely, they either would not have purchased the Class Vehicles or they would have paid less for them.

155.     As a direct and proximate result of Ford's unfair, deceptive, and unconscionable practices, Plaintiff Straub and the North Carolina Sub-Class have been damaged in an amount in excess of $25,000.00 and are entitled pursuant to N.C. Gen. Stat. § 75-16 to recover treble damages as well as attorneys' fees and costs.

## FIFTH CAUSE OF ACTION
**Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")**
**Fla. Stat. §§ 501.201, *et seq*.**
**(On behalf of the Florida Sub-Class)**

156.     Plaintiffs James and Tiffany Ranum hereby incorporate by reference the allegations contained in the previous paragraphs of this Complaint.

157.     Plaintiffs James and Tiffany Ranum bring this claim on behalf of themselves and the Florida Sub-Class.

158.     Plaintiffs James and Tiffany Ranum and the Florida Sub-Class are "consumers" within the meaning of Fla. Stat. § 501.203(7).

159.     Ford engaged in "trade" or "commerce" within the meaning of Fla. Stat. § 501.203(8). The FDUTPA makes it unlawful to use "[u]nfair methods of competition,

unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …" Fla. Stat. § 501.204(1).

160.   By selling and making misrepresentations and material omissions to Plaintiffs James and Tiffany Ranum and the Florida Sub-Class regarding the Class Vehicles, Ford affected commerce and trade within the State of Florida. Specifically, Ford engaged in unfair or deceptive acts or practices in violation of the FDUTPA when, in connection with selling and advertising the Class Vehicles, Ford:

  a.   Represented that the engines in the Class Vehicles were safe and reliable for providing transportation;

  b.   Represented that the Class Vehicles and their engines were fit for their intended purpose; and

  c.   Actively concealed and failed to disclose or otherwise provide notice or adequate warnings that the Class Vehicles suffered from the uniform Flexplate Defect, which posed a material and significant safety risk, and of which Ford had knowledge.

161.   Ford knew of the dangerous and defective nature of the Flexplate Defect, yet continued to sell and distribute the Class Vehicles.

162.   Ford's acts and omissions posed the tendency or capacity to mislead or create the likelihood of deception regarding a material fact.

163.   Ford knew that the flexplates in Class Vehicles were defective, would fail prematurely, were not suitable for use, and otherwise were not as warranted and represented.

164.   Ford's acts and omissions, as described herein, repeatedly occurred in its trade or commerce, and were capable of deceiving a substantial portion of the consuming public.

165.    Ford's misrepresentations, concealment, omissions, and other deceptive conduct were likely to deceive, cause misunderstanding, and/or, in fact, caused Plaintiffs James and Tiffany Ranum and the Florida Sub-Class to be deceived about the suitability of Class Vehicles for their ordinary and expected use, and about whether they would be backed by Ford's written warranties.

166.    Ford intended that Plaintiffs James and Tiffany Ranum and the Florida Sub-Class would rely on its misrepresentations, concealment, warranties, deceptions, and/or omissions regarding the suitability, durability, and useful life of Class Vehicles.

167.    The facts concealed or not disclosed by Ford are, and would be, material in that Plaintiffs James and Tiffany Ranum, the Florida Sub-Class, and any reasonable consumer would have considered the Flexplate Defect important in deciding whether to purchase Class Vehicles.

168.    Had Plaintiffs James and Tiffany Ranum and the Florida Sub-Class known that the flexplates in the Class Vehicles were defective and would fail prematurely, they either would not have purchased the Class Vehicles or they would have paid less for them.

169.    As a direct and proximate result of Ford's unfair and deceptive trade practices, Plaintiffs James and Tiffany Ranum and the Florida Sub-Class suffered ascertainable losses and actual damages.

170.    Plaintiffs James and Tiffany Ranum and the Florida Sub-Class did not receive the benefit of their bargains.

171.    Pursuant to Fla. Stat. §§ 501.2105(1)-(2), Plaintiffs James and Tiffany Ranum and Florida Sub-Class Members seek an order enjoining Defendant's unfair and/or deceptive acts or practices, and awarding damages and any other just and proper relief available under FUDTPA.

**PRAYER FOR RELIEF**

Plaintiffs, individually and on behalf of the proposed Class and Sub-Classes, request the Court enter judgment against Ford, and accordingly request the following:

A.      An order certifying the proposed Class and Sub-Classes and designating Plaintiffs as named representatives and designating the undersigned as Class Counsel;

B.      A declaration that Ford is financially responsible for notifying all consumers about the Flexplate Defect and its potential hazardous consequences;

C.      An order: (1) enjoining Ford from further deceptive acts including distribution, sales, and lease practices with respect to its Class Vehicles; (2) requiring removal and replacement of Plaintiffs and Class Members' dangerously defective flexplates with a safe alternative product; and (3) requiring repair and/or replacement of any other part or component of the Class Vehicles damaged or destroyed as a result of the Flexplate Defect;

D.      An order enjoining Ford from concealing the existence of the Flexplate Defect during distribution, sales, and advertisements, as well as during customer and warranty service visits for the Class Vehicles;

E.      An award to Plaintiffs and Class Members of compensatory, actual, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

F.      An order requiring Ford to issue a recall of all Class Vehicles;

G.      An award of pre-judgment and post-judgment interest, as provided by law; and

H.      Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand a trial by jury as to all matters so triable.

Dated: March 22, 2021

/s/ Nick Suciu III

Nick Suciu III (P72052)
BARBAT, MANSOUR, SUCIU & TOMINA PLLC
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
Telephone: (313) 303-3472
nicksuciu@bmslawyers.com

Mark E. Silvey
William A. Ladnier
Jonathan Cohen (*pro hac vice* to be filed)
GREG COLEMAN LAW PC
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Telephone: (865) 247-0080
Facsimile: (865) 522-0049
mark@gregcolemanlaw.com
will@gregcolemanlaw.com
jonathan@gregcolemanlaw.com

Daniel K. Bryson (*pro hac vice* to be filed)
J. Hunter Bryson (*pro hac vice* to be filed)
WHITFIELD BRYSON LLP
900 W. Morgan St.
Raleigh, NC 27603
Telephone: (919) 600-5000
Facsimile: (919) 600-5035
dan@wbmllp.com
hunter@wbmllp.com

*Attorneys for Plaintiffs*